Ahern v. United States                    04-CV-474-SM  04/29/05

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


<u>United States of America</u>

     v.                                    Criminal No. 00-cr-148-1-SM
                                        Opinion No. 2005 DNH 075
<u>Sean Ahern</u>                                   


_____

<u>Sean Ahern</u>,
     Petitioner

     v.                                    Civil No. 04-cv-474-SM

<u>United States of America</u>,
     Respondent


## O R D E R


Sean Ahern was convicted of armed bank robbery.  Before the court are his: (1) motion for a new trial based upon newly discovered evidence, pursuant to FED. R. CRIM. P. 33(b)(1); and (2) petition to vacate convictions and sentence pursuant to 28 U.S.C. § 2255.  The government objects to both the motion and the petition.  For the reasons given, Ahern's motion is denied and his petition is dismissed.

## Motion for a New Trial (Rule 33)

Under FED. R. CRIM. P. 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  In this circuit,

> "[a] motion for new trial on the basis of newly discovered evidence will ordinarily not be granted unless the moving party can demonstrate that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant." United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980). "The defendant must meet all four prongs of the Wright test in order to succeed on a Rule 33 motion.  A defendant's new trial motion must be denied if he fails to meet any one of these factors." United States v. Colon-Munoz, 318 F.3d 348, 360 (1st Cir. 2003) (internal quotation marks omitted).

United States v. Rodriguez-Marrero, 390 F.3d 1, 14 (1st Cir. 2004).  "The remedy of a new trial is rarely used; it is warranted 'only where there would be a miscarriage of justice' or 'where the evidence preponderates heavily against the verdict.'" United States v. Andrade, 94 F.3d 9, 14 (1st Cir. 1996) (quoting United States v. Indelicato, 611 F.2d 376, 386) (1st Cir. 1979)).

2

Here, defendant's purported new evidence consists of: (1) an unsworn, unsigned statement reporting a March 11, 2004, conversation with Christopher Doucette, a New Hampshire State Prison ("NHSP") inmate who allegedly overheard fellow inmate Kevin Gil talking about a bank robbery that he (Gil) had committed in Portsmouth;[1] (2) Gil's unsworn statement about a bank robbery he claims to have committed in New Hampshire in "June just after [his] release from Mass. prison;" and (3) an unsworn, unsigned statement reporting a March 26, 2004, conversation with Gil, in which Gil admitted to robbing a bank in Portsmouth, New Hampshire in June.[2] Defendant also submits: (1) an April 4, 2004, note from Gil to defendant's former attorney, Robert Dimler, in which Gil expressed his concern that he might need an attorney in the event he was charged in the bank robbery to which he had confessed; (2) several pages of the transcript of defendant's trial; (3) a March 31, 2004, letter from Gil to attorney Dimler, reporting that a potential witness he (Gil) had

---

[1] This statement is presumably that of a private investigator named William Desmond who was hired by defendant or on his behalf.

[2] This statement is also presumably that of private investigator Desmond. Neither Gil's statement nor the report of the conversation with Gil gives the year in which Gil claims to have robbed a bank in New Hampshire.

3

tried to contact had died; and (4) a sheet of data, represented to be FBI bank robbery statistics.

The government objects to defendant's motion, arguing that defendant's evidence does not meet the first, second, and fourth prongs of the Wright test.[3]  Defendant objects to the government's late filing of its objection to his motion, and further argues that his motion meets all four prongs of the Wright test.

Defendant's motion is denied because his purported exculpatory evidence fails to meet the fourth prong of Wright; the new "evidence" he has proffered would not "probably result in an acquittal upon retrial."  Wright, 625 F.2d at 1019; see also

---

[3] In further support of its objection to defendant's motion, the government submits two additional pieces of evidence: (1) a letter seized from an NHSP inmate discussing a plan to fabricate evidence implicating another person in the commission of the crime for which defendant was convicted (the letter was sealed in an envelope bearing defendant's parents' address as its return address and was addressed to Jim Davis, who was identified through trial testimony as an acquaintance of defendant's); and (2) a letter from another NHSP inmate implicating defendant in a plot to fabricate and plant evidence implicating Kevin Gil in the commission of the crime for which defendant was convicted.  The government's proffer, however, plays no part in the court's ruling on defendant's motion.

United States v. Gonzalez-Gonzalez, 258 F.3d 16, 20 (1st Cir. 2001) (explaining that fourth prong of Wright requires "an 'actual probability that an acquittal would have resulted if the evidence had been available'") (quoting United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993)).

As a preliminary matter, all of defendant's new evidence is unsworn (and exhibits one and three are also unsigned), which detracts considerably from its reliability. Typically, a defendant seeking a new trial in circumstances such as these offers not just statements, but affidavits, see, e.g., Awon v. United States, 308 F.3d 133, 140-41 (1st Cir. 2002); United States v. Montilla-Rivera, 171 F.3d 37, 42 (1st Cir. 1999). The lack of sworn affirmation has been held to diminish the credibility of a statement exonerating a convicted defendant, see, e.g., United States v. Simmons, 714 F.2d 29, 32 (5th Cir. 1983) ("If the co-defendant in La Duca had little to lose, Bubba has even less since his statement is not even sworn."). More importantly, the evidence exhibits a variety of weaknesses which render it unlikely to have resulted in a different verdict at trial.

For example, it is claimed that Gil said he robbed a bank in New Hampshire, but no further information is given regarding the bank's location.[4]  By contrast, both of the private investigator statements refer to a bank robbery Gil admits to having committed in Portsmouth, New Hampshire.[5]  It is difficult to imagine a jury being swayed by a self-proclaimed bank robber who cannot place himself at the scene of his crime.

A more critical problem with defendant's new evidence concerns the getaway vehicle.  At trial, considerable evidence was introduced showing that the person who robbed the Bank of New

---

[4] The only specific location information in Gil's statement concerns his abandonment of the car he used during his alleged bank robbery.  He claims to have abandoned it in a parking lot in Portsmouth.  However, the car identified at the scene of the crime as the getaway vehicle in defendant's case was found, with defendant's finger prints on it, in a parking lot in Dover.

[5] Defendant attempts to fill the gap in Gil's statement and reconcile the discrepancy between the investigator statements and the trial evidence by referring to FBI statistics showing that no Portsmouth banks were robbed in 2000 and arguing that since no Portsmouth bank was robbed, Gil's reported reference to a Portsmouth bank must be assumed to be a reference to the bank in Dover that defendant was convicted of robbing.  Defendant's attempt at rehabilitation is implausible; his evidence is what it is, and in that evidence, Gil is reported by two others as saying the bank he robbed was in Portsmouth, and says himself that he robbed the New Hampshire bank defendant was convicted of robbing, but gives neither its name nor location – information a bank robber would reasonably be expected to know.

Hampshire branch on Central Avenue in Dover, New Hampshire, on June 10, 2000, made his getaway in a car that had been stolen the day before in Portsmouth, New Hampshire.  Gil, however, claims that he made his getaway in a car that he had stolen in Lowell/Dracut, Massachusetts.  Given the detailed trial testimony about the getaway car used in the Dover robbery, including evidence concerning its theft, its use in the robbery, its abandonment near the scene of the crime, and the presence of defendant's fingerprints on it, Gil's testimony about robbing a bank in a different automobile (assuming he would so testify under oath) would not likely result in a different trial outcome for defendant.

Finally, there is the question of Gil's credibility.  On the one hand, defendant provides no information about Gil, and offers no reason why a jury might credit his story.  On the other hand, Gil is a prison inmate, and while defendant does not disclose the crime(s) for which Gil is being incarcerated, Gil himself admits to being a murderer, which suggests that he is serving a substantial prison term and, thus, has little or nothing to lose in the way of additional punishment by "admitting" to another

7

crime.  In Awon, 308 F.3d 133 (1st Cir. 2002), the court of appeals for this circuit affirmed the denial of a motion for a new trial where the denial was based, in part, on the district court's determination that an affiant confessing to the defendant's crime of conviction was not credible, id. at 141. According to the court:

> By the time of his affidavit St. Louis had nothing to lose by exonerating Awon.  He had already been convicted and sentenced.  He was in a position to say whatever he thought might help Awon, "even to the point of pinning all the guilt on [himself], knowing [he was] safe" from any increased punishment for the transaction.  United States v. Montilla-Rivera, 171 F.3d 37, 41 (1st Cir. 1999) (quoting United States v. Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir. 1992)). We accept the court's finding that St. Louis's affidavit was not credible.

Awon, 308 F.3d at 141.  The new evidence in Awon and Montilla-Rivera consisted of exculpatory affidavits filed by co-conspirators.  See Awon, 308 F.3d at 141; Montilla-Rivera, 171 F.3d at 42.  Gil is not a co-conspirator in this case, but that is a distinction without a difference.  Gil's own statement suggests he is serving a sentence for murder, and defendant does not say how Gil's statement might put him at any risk.  That is, like the statements of witnesses whose "stories do not [create]

8

the risk of implicating [them] in other criminal acts," Rodriguez-Marrero, 390 F.3d at 15, the statement by Gil, while implicating him in a criminal act, does not appear to create any risk of substantially increasing the amount of time he will spend in prison, given his current incarceration for murder.

Because defendant's purported new evidence consists merely of unworn statements, and in light of the substantial, objectively reliable evidence presented against defendant at trial (i.e., fingerprints, identity of the getaway car used, location of the bank robbed, bank surveillance photographs depicting a tell-tale mark on the robber's (and on defendant's) neck, etc.), much of which is flatly irreconcilable with defendant's new evidence, and given the gaps and inconsistencies in that new evidence, and given the inherent unreliability of Gil's supposed exculpatory statement, defendant's new evidence would not likely result in a different outcome at trial. Accordingly, defendant's motion for a new trial based upon newly discovered evidence is denied.

**Petition to Vacate Convictions (18 U.S.C. § 2255)**

28 U.S.C. § 2255 provides that a federal prisoner may move the court that sentenced him to "vacate, set aside or correct [his] sentence" and that the court "shall vacate and set the judgment aside and discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate" if

> the judgment was rendered without jurisdiction, or . . . the sentence imposed was not authorized by law or otherwise open to collateral attack, or . . . there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack . . . .

Id.

Here, petitioner raises seventeen separate challenges to his conviction and sentence. Claim 1 asserts a violation of petitioner's Sixth Amendment right to a public trial. Claims 2, 6, 7, 8, and 9 assert violations of his rights under the Sixth Amendment's Confrontation Clause. Claims 3 and 4 assert that newly discovered evidence warrants a new trial. Claim 5 asserts

10

a Sixth Amendment <u>Blakely</u>/<u>Booker</u>/<u>Fanfan</u>[6] violation.  Claim 10
asserts that the court committed plain error in sentencing
defendant as a career offender.  Claims 11 through 16 assert
ineffective assistance of trial counsel.  Claim 17 asserts
ineffective assistance of appellate counsel.

## 1. Claims 1 & 12 - Courtroom Closure

Petitioner claims that he suffered a violation of his Sixth
Amendment right to a public trial because his mother was excluded
from the courtroom just prior to jury selection.  He also claims
that his attorney's participation in the exclusion of his mother
constituted ineffective assistance of counsel.  The government
responds that the exclusion was requested by it, and was agreed
to by defense counsel, in accordance with Fed. R. Evid. 615.
(Rule 615, by its terms, does not apply to the circumstances
described by petitioner.)

According to affidavits filed by petitioner, an Assistant
U.S. Attorney asked petitioner's trial counsel to direct

_____

[6] <u>Blakely v. Washington</u>, 542 U.S. ___, 124 S. Ct. 2531
(2004); <u>United States v. Booker</u>, 543 U.S. ___, 125 S. Ct. 738
(2005).

11

petitioner's mother to leave the courtroom prior to jury selection. Trial counsel apparently relayed that request in the form of a directive to petitioner's mother, without first consulting him. Petitioner's mother complied by leaving the courtroom during jury voir dire. The government does not challenge the factual basis of petitioner's claim, other than to state that it "has no specific recollection as to when petitioner's mother was asked to leave the courtroom." (Gov.'s Obj. (document no. 5) at 9.) It is undisputed that the presiding judge, the undersigned, was not asked to rule on a motion to exclude petitioner's mother, or any other potential witness, from the courtroom, and neither the court nor anyone acting on behalf of the court, directed that petitioner's mother be excluded from the courtroom.

In Waller v. Georgia, 467 U.S. 39 (1984), the Supreme Court pointed out that the Sixth Amendment right to a public trial "extend[s] . . . to the voir dire proceeding in which the jury is selected." Id. at 45 (citing Press-Enterprise Co. v. Superior Court, 464 U.S. 501 (1984)). The Waller court also set out a

12

four-part test[7] for trial courts to use in determining whether to grant a party's request for a courtroom closure.  Id. at 48 (citing Press-Enterprise, 464 U.S. at 511-12).

While Waller dealt with a total closure (of a suppression hearing), five circuits have ruled that the Waller analysis, in slightly modified form,[8] is also applicable to partial courtroom closures, including the exclusion of specific individuals.  See United States v. Osborne, 68 F.3d 94 (5th Cir. 1995) (applying modified Waller test when trial judge ordered defendant's sister to leave courtroom, and barred new spectators from entering, during testimony of one witness); United States v. Farmer, 32 F.3d 369 (8th Cir. 1994) (applying modified Waller test when

_____

[7] Under the Waller test,

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

467 U.S. at 48.

[8] To evaluate the constitutionality of a partial closure, the first prong of the modified Waller test requires the judge to articulate a "substantial reason" rather than an "overriding interest" before closing the courtroom.  Woods v. Kuhlmann, 977 F.2d 74, 76 (2d Cir. 1992).

13

trial judge ordered all spectators, except rape victim's family, to leave courtroom during victim's testimony); Woods, 977 F.2d 74 (applying modified Waller test when trial judge excluded all members of defendant's family during testimony of one witness); United States v. Galloway, 937 F.2d 542, 545 (10th Cir. 1991) (applying modified Waller test when trial judge closed courtroom "to all but the defendant, the relatives of the complaining witness and the defendant, courtroom personnel, attorneys for the parties, and the press" during testimony of complaining witness in kidnapping trial) (citing Nieto v. Sullivan, 879 F.2d 743 (10th Cir. 1989)); United States v. Sherlock, 962 F.2d 1349 (9th Cir. 1992) (applying modified Waller test when trial judge excluded members of defendants' families during testimony of rape victim); Douglas v. Wainwright, 739 F.2d 531 (11th Cir. 1984) (applying modified Waller test when trial judge excluded general public (but did not exclude press or families of defendant, victim, and witness) during testimony of one witness). And in United States v. DeLuca, 137 F.3d 24 (1st Cir. 1998), the court of appeals for this circuit appears to have held – although it is a bit difficult to say for certain – that a screening and identification procedure for trial spectators constituted a

14

partial closure subject to modified <u>Waller</u> analysis. <u>Id.</u> at 33-35.

However, not every erroneous partial courtroom closure warrants relief, or even rises to the level of a constitutional violation. In <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991), the Supreme Court categorized denial of the right to a public trial as a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," <u>id.</u> at 310, which would seem to suggest that <u>any</u> error leading to <u>any</u> deprivation of a public trial would be grounds for a new trial without a showing of actual prejudice. But "<u>Fulminante</u>'s list of examples of violations that have been held exempt from harmless error review [does not] mean that any violation of the same constitutional right is a 'structural defect' regardless whether the error is significant or trivial." <u>Brown v. Kuhlmann</u>, 142 F.3d 529, 540 (2d Cir. 1998) (quoting <u>Yarborough v. Keane</u>, 101 F.3d 894, 897 (2d Cir. 1996); citing <u>United States v. Canady</u>, 126 F.3d 352, 364 (2d Cir. 1997)). To the contrary, "in order to determine whether a particular error is structural '[the court] must look not only to the right

15

violated, but also at the particular nature, context, and significance of the violation.'" Brown, 142 F.3d at 540 (quoting Yarborough, 101 F.3d at 897; citing United States v. Gonzalez, 110 F.3d 936, 946 (2d Cir. 1997)).

In Brown, the court of appeals reversed the district court's grant of a writ of habeas corpus based upon a state trial judge's clearing and sealing the courtroom prior to the testimony of an undercover police officer. 142 F.3d at 539 ("Even if the courtroom should not have been closed during the testimony of Officer Roe, it is unnecessary to set aside the conviction here."). In doing so, the court of appeals determined that under the circumstances, the closure of the courtroom was not a structural defect. Id. at 544 ("this case involves a courtroom closure that was not substantial enough to undermine the values furthered by the public trial guarantee"). In Yarborough, the court of appeals affirmed the district court's denial of a petition for writ of habeas corpus arising out of the defendant's absence from a hearing, held in the state trial judge's robing room, to determine whether a prospective witness had been improperly influenced by testimony he heard while in the

16

courtroom without the prosecutor's knowledge.  101 F.3d at 895.

Because "[t]he absence of the defendant from a hearing under

[those] circumstances [did] not call into question the

fundamental fairness of the trial," id. at 898, the court held

that it was not a structural defect, and, consequently, applied a

harmless error test.  Id.  In Braun v. Powell, 227 F.3d 908 (7th

Cir. 2000), a state trial judge erroneously excluded, from the

entire trial, "a member of the jury venire panel [who] had been

excused because he had said that he was friendly to the defense."

Id. at 910.  However, the court of appeals held that the

exclusion was not a Sixth Amendment violation because:

> There is no reason to believe that Ms. Braun's trial
> was any less fair, or that the court officers or
> witnesses took their roles any less seriously, because
> of the exclusion of this one spectator.  Indeed, the
> exclusion was implemented, albeit mistakenly from what
> appears in this record, by the trial court to avoid any
> prejudice to the defendant.  Moreover, although the
> record gives no justification for such action on the
> part of the trial judge, it is difficult to see any
> basis for attributing any significant detriment to the
> integrity of the trial proceedings to it.  Mane's
> presence or absence from the trial does not appear to
> have had any effect on encouraging witnesses to come
> forward or on discouraging perjury.

Id. at 919.[9]

The absence of petitioner's mother from the courtroom during voir dire falls comfortably within the universe of courtroom exclusions found by other courts to be sufficiently insignificant to qualify for harmless error review, rather than warranting the automatic retrial occasioned by an inherently prejudicial structural defect. Brown involved a total clearing of the courtroom rather than the absence of a single spectator; Yarborough involved the exclusion of the defendant rather than a spectator; and Braun involved the exclusion of a spectator from the entire trial rather than just a part of it. As in those cases, "[t]he brief courtroom closure here did not affect the

---

[9] In its analysis, the Braun court spoke of "the many factual circumstances that a court must analyze in assessing whether the closure at issue in a particular case is one that implicates the constitutional guarantee of a public trial," 227 F.3d at 918, and then cited with approval Peterson v. Williams, 85 F.3d 39, 42 (2d Cir. 1996), for distilling the four basic reasons behind the right to a public trial:

> 1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury.

Braun, 227 F.3d at 918 (citation omitted).

fairness of the trial or alter its outcome.  Nor can it be said to have seriously undermined the most frequently cited considerations underlying the Public Trial Clause of the Sixth Amendment."  Brown, 142 F.3d at 534.  Thus, the absence of petitioner's mother from voir dire did not constitute a structural defect in petitioner's trial.

As noted, the court was not notified of any issue related to excluding petitioner's mother from voir dire.  And petitioner has identified no precedent, nor has the court found any, suggesting that a criminal defendant's public trial right is violated by a courtroom exclusion effected by means other than a court order.  Petitioner's Claim 1 is without merit.  Absent a court order of closure to review, there is simply no way to conduct a meaningful Waller analysis.

Claim 12, petitioner's assertion that he suffered from ineffective assistance of trial counsel because his attorney failed to object to – and in fact acquiesced in – the government's request to exclude petitioner's mother from the

19

courtroom, is equally unavailing.[10]  Because the absence of

_____

[10] A similar argument was raised, and rejected, in <u>Girtman</u>
<u>v. Lockhart</u>, 942 F.2d 468 (8th Cir. 1991).  In that case,
"Girtman argue[d] that his defense attorney was ineffective,
because he (1) agreed to examine prospective jurors in the trial
judge's chambers without consulting Girtman . . ."  <u>Id.</u> at 471.
"Girtman argue[d] that his defense attorney's failure to protect
his right to a public trial, or to consult him before waiving
this right, constituted ineffective assistance of counsel."  <u>Id.</u>
The court of appeals disagreed:

>       Undoubtedly, Girtman's attorney should have
> consulted Girtman before waiving his right to a public
> trial.  However, we fail to see how Girtman's defense
> was impaired by the closed voir dire.  We therefore
> find that the defense attorney's closure of <u>voir dire</u>
> was not prejudicial to Girtman's defense, and that the
> attorney's error did not constitute ineffective
> assistance of counsel.  <u>See</u> <u>Strickland v. Washington</u>,
> 466 U.S. 668, 692 (1984) (counsel ineffective only if
> his or her errors "prejudicial to the defense").

<u>Id.</u> (parallel citations omitted).  <u>Girtman</u>, however, is not on
all fours with this case, because in <u>Girtman</u>, there was evidence
in the record that the defense attorney's closure of the voir
dire was a calculated trial strategy.  <u>Id.</u> ("The defense attorney
later explained that 'he always attempts to close the <u>voir dire</u>
because he does not want the entire panel to be tainted by what
is said [by one prospective juror], particularly in "out of
county" cases such as this one, where he does not know any of the
people.'").  Here, however, there is no suggestion that
petitioner's counsel agreed to the exclusion of petitioner's
mother from voir dire as part of a carefully considered trial
strategy; rather, all indications point toward inadvertence or
misunderstanding on the part of the government and/or
petitioner's counsel.  This seems especially likely, given the
government's uncertainty as to precisely when petitioner's mother
left the courtroom, and its reliance upon FED. R. EVID. 615, which
does not, literally, support the exclusion of a potential witness
from voir dire.

petitioner's mother from the courtroom did not constitute a structural defect, his counsel's contribution to her absence was not ineffective assistance per se, but, rather, must be considered under the standard two-part test established by Strickland, under which "[a] claim of ineffective assistance requires a showing that the attorney turned in a constitutionally deficient performance that prejudiced the defendant's substantial rights." United States v. Moran, 393 F.3d 1, 10 (1st Cir. 2004) (citing Strickland, 466 U.S. at 687). Prejudice, in turn, consists of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Allison v. Ficco, 388 F.3d 367, 369 (1st Cir. 2004) (quoting Strickland, 466 U.S. at 694). Here, petitioner does not argue – nor could he – that the result of his trial would have been different had his mother been present for voir dire. Thus, Claim 12 also fails.

2. Claims 2 & 8 - Confrontation

Petitioner asserts that his Sixth Amendment confrontation right was violated by: (1) the government's reference, during its opening statement, to the proposed testimony of Jason Markievitz,

21

who ultimately did not testify (Claim 2); and (2) James Steele's testimony regarding what he and his roommate (who did not testify) saw from their apartment window prior to the robbery (Claim 8).  In petitioner's view, his confrontation clause rights were violated because he had no opportunity to cross-examine either Markievitz or Steele.  He also asserts ineffective assistance of counsel (Claim 14), based upon his trial counsel's failure to object to the government's reference to Markievitz, and Steele's reference to his roommate.  The government argues that both Claims 2 and 8 are procedurally defaulted by virtue of petitioner's failure to raise them on direct review.

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" Bousley v. United States, 523 U.S. 614, 622 (1998) (citing Murray v. Carrier, 477 U.S. 478, 485, 496 (1986); Wainwright v. Sykes, 433 U.S. 72, 87 (1977); Smith v. Murray, 477 U.S. 527, 537 (1986)).  Because defendant relies upon the "actual innocence" prong of Bousley, but has failed to establish his actual

innocence, his procedural default is not excused, and Claims 2 and 8 must be dismissed.

Moreover, as the government correctly points out, even if Claims 2 and 8 were not procedurally defaulted, they would fail on the merits. Regarding Claim 2, "[t]he confrontation clause does not come into play where a potential witness neither testifies nor provides evidence at trial." United States v. Porter, 764 F.2d 1, 9-10 (1st Cir. 1985) (citing United States v. Coven, 662 F.2d 162, 170 (2d Cir. 1981); Houser v. United States, 508 F.2d 509, 518 (8th Cir. 1974); Turnbough v. Wyrick, 420 F. Supp. 588 (E.D. Mo. 1976), aff'd 551 F.2d 202 (8th Cir. 1977)). Because Markievitz did not testify at petitioner's trial, no right of confrontation ever arose as to him. Regarding Claim 8, neither the confrontation clause nor the case of Crawford v. Washington, 541 U.S. ___, 124 S. Ct. 1354 (2004), is implicated because Steele testified to what his roommate saw (not what he said) thus raising no issue of testimonial evidence or hearsay from the roommate.

23

Finally, because Claims 2 and 8 are both meritless, petitioner's trial counsel did not provide ineffective assistance by failing to raise objections based upon those claims at trial (Claim 14), and petitioner's appellate counsel did not provide ineffective assistance by failing to raise similar claims on appeal (Claim 17).

3. Claims 3 & 4 - New Evidence

Petitioner claims that he is entitled to habeas relief based upon two different pieces of newly discovered evidence: the confession of Kevin Gil (Claim 4), and several newspaper photographs that allegedly call into question the reliability of the surveillance photographs introduced at trial (Claim 3). For the reasons given in the denial of petitioner's Rule 33 motion for a new trial, the alleged confession of Gil does not entitle petitioner to habeas relief.

Petitioner's photographic "new evidence" consists of two still photographs, taken from bank surveillance tapes and published in local newspapers shortly after the bank robbery. Petitioner contends that the newspaper photographs do not show a

24

black mark on the robber's neck, which calls into question the accuracy and/or authenticity of the government's trial exhibits nine through twelve, photographs from the bank surveillance tape, which showed a robber who did have a black mark on his neck. In petitioner's view, the fact that photographs published before he became a suspect showed a robber with no black mark on his neck makes it likely that the jury, had it been presented with those photographs, would have found him not guilty. The government argues that petitioner's "new" evidence was published in local newspapers in June 2000, eighteen months before his trial, and that petitioner has given no good reason why a claim based upon those photographs was not raised on direct review.

While the court of appeals for this circuit has "not decide[d] whether newly discovered evidence is a cognizable ground for obtaining a new trial in proceedings under § 2255," Moreno-Morales v. United States, 334 F.3d 140, 149 (1st Cir. 2003) (citing Barrett v. United States, 965 F.2d 1184, 1194 (1st Cir. 1992); Cruz-Sanchez v. Rivera-Cordero, 835 F.2d 947, 948 (1st Cir. 1987)), it has "stated that 'at a minimum, petitioner would be required to meet the conventional criteria for obtaining

25

a new trial on the ground of newly discovered evidence.'" Moreno-Morales, 334 F.3d at 149 (quoting Barrett, 965 F.2d at 1194). According to the Moreno-Morales court's articulation of the Wright test, petitioner is required to prove four elements: "(1) the newly discovered evidence was unknown or unavailable at the time of trial; (2) the defendant was duly diligent in trying to discover it; (3) the evidence was material; and (4) the evidence was such that it would probably result in an acquittal upon retrial." 334 F.3d at 49 (quoting Awon, 308 F.3d at 140).

Here, petitioner's "newly discovered" evidence was plainly available at the time of trial, having been published eighteen months beforehand. While the newspaper photographs may not have been known to defendant, it is difficult to characterize something published in a newspaper as "unknown." Moreover, only modest diligence would have been necessary to uncover that evidence prior to trial. But more fundamentally, the weight of the evidence in this case is such that even had petitioner discovered the newspaper photographs and introduced them at trial, it is highly unlikely that their introduction would have led to a different result. Perhaps petitioner's claim would be

26

stronger if his "new evidence" consisted of photographs from which trial evidence had been derived, rather than consisting of photographs that were themselves derived from the same source as the trial evidence, i.e., the bank surveillance tape. But even if petitioner were able to create some doubt regarding the reliability of the photographs introduced at trial, it is not likely that introduction of the newspaper photographs (which, after all, were simply stills taken from the bank video tape) would have resulted in acquittal, given the persuasive evidence against petitioner and the fact that the newspaper photographs were at least one generation further removed from the surveillance tape that produced them than were the stills introduced by the government at trial. Because petitioner's newly discovered photographic evidence fails to satisfy three of the four prongs of Wright, Claim 3 is dismissed.

### 4. Claim 5 - Blakey/Booker/Fanfan

Petitioner claims that sentencing enhancements for being a career offender, for robbing a financial institution, and for stealing more than $10,000, as well as the court's restitution order and its recommendation of intensive drug treatment are all

invalid because they are the result of judicial factfinding, in violation of the Supreme Court's recent holding in United States v. Booker, 543 U.S. ___, 125 S. Ct. 738 (2005). Petitioner's conviction became final on December 15, 2003, when the United States Supreme Court denied certiorari. Ahern v. United States, 540 U.S. 1093 (2003). The Booker decision can only apply to petitioner's case if its holding is retroactive. It is not. See Cirilo-Muñoz v. United States, No. 02-1846 (1st Cir. Apr. 15, 2005). The new rule announced in Booker is procedural rather than substantive in nature. Moreover, the rule does not qualify as a "watershed rule" that implicates "the fundamental fairness and accuracy of the criminal proceeding." Saffle v. Parks, 494 U.S. 484, 495 (1990). And, as the court of appeals for this circuit has held, "the use of judge-made findings at sentencing does not undermine 'accuracy' (in terms of substantially different outcomes) or undermine fundamental fairness." Cirilo-Muñoz slip op. at ___. Accordingly, Booker does not apply retroactively to final convictions such as petitioner's. See McReynolds v. United States, 397 F.3d 479, 480-81 (7th Cir. 2005); Schriro v. Summerlin, 542 U.S. ___, 124 S. Ct. 2519, 2523-26 (2004); Sepulveda v. United States, 330 F.3d 55, 63, (1st Cir.

28

2003).  Accordingly, Claim 5 is dismissed as is that portion of Claim 17 (ineffective assistance of appellate counsel) pertaining to the issue raised in Claim 5.

5. Claims 6, 7 & 9 – Confrontation

Petitioner claims that his Sixth Amendment right to confront witnesses against him was violated by: (1) being compelled to show his hands and teeth to the jury after the government had called its last witness (Claim 6); (2) introduction of a tape recording of a telephone conversation which also purportedly contained, in the background, the sounds of money being counted (Claim 7); and (3) the government's explanation, during closing argument, of a discrepancy between the testimony of two witnesses regarding the direction in which the eventual getaway car was driven immediately after it was initially stolen (Claim 9).  All three arguments were raised, and rejected, on direct appeal.  See United States v. Ahern, 68 Fed. Appx. 209 (1st Cir. 2003).  Because all three claims were decided against petitioner on direct appeal, they may not be relitigated in this habeas petition.  See Argencourt v. United States, 78 F.3d 14, 16 n.1 (1st Cir. 1996) (citing United States v. Michaud, 901 F.2d 5, 6

(1st Cir. 1990) (per curiam)). Accordingly, Claims 6, 7, and 9 are dismissed, as is Claim 14, which asserts ineffective assistance of trial counsel based upon counsel's alleged failure to protect petitioner's right to confrontation.

## 6. Claims 10 & 13 - Sentencing as a Career Offender

Petitioner claims that the court committed plain error by considering two prior state convictions for assault to be crimes of violence for purposes of classifying him as a career offender (Claim 10), that his trial counsel provided ineffective assistance by not challenging the court's reliance upon those two convictions at sentencing (Claim 13), and that his appellate counsel provided ineffective assistance by failing to raise the substance of Claim 10 on appeal (Claim 17). More specifically, petitioner contends that his prior convictions for second degree assault should not have counted as violent felonies because he was convicted of "reckless assault," which offense lacks the necessary mens rea to qualify as a crime of violence. The government counters that Claim 10 was procedurally defaulted by petitioner's failure to raise it on appeal.

30

Because petitioner did not argue, on appeal, that his two assault convictions were not crimes of violence, he is procedurally defaulted from raising them here unless he can "demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent,'" Bousley, 523 U.S. at 622 (citations omitted). As noted above, petitioner has failed to demonstrate his actual innocence. Moreover, he was not prejudiced by the failure to raise this argument, because the argument is legally incorrect; it is well established that a felony involving recklessness can be a violent felony for purposes of the sentencing guidelines. See, e.g., United States v. Hernandez, 309 F.3d 458, 462 (7th Cir. 2002) (quoting United States v. Rutherford, 54 F.3d 370, 374 (7th Cir. 1995) ("we have noted that reckless conduct may properly be characterized as a crime of violence if it presents 'a serious potential risk of physical injury to another.'"); cf. United States v. Matthews, 278 F.3d 560, 562-63 (6th Cir. 2002) (rejecting defendant's claim that "prior conviction . . . for reckless aggravated assault does not count as a 'violent felony' such that he is eligible for sentencing under the Armed Career Criminal Act"). Petitioner's convictions for assault were correctly characterized as crimes of

31

violence. Thus, the issue was procedurally defaulted, and he was not actually prejudiced by counsel's failure to raise the issue at trial. Moreover, because the claim was meritless, neither his trial counsel nor his appellate counsel provided ineffective assistance by failing to raise it; counsel are not obligated to raise issues with no merit. Accordingly, Claims 10 and 13, and that portion of Claim 17 pertaining to this issue, are all dismissed.

## 7. Claim 11 - Ineffective Assistance of Trial Counsel

Claim 11 does not appear to be a separate claim but, rather, a general discussion of and introduction to petitioner's specific claims of ineffective assistance of trial counsel. As such, it requires no further comment.

## 8. Claims 15 & 16 - Ineffective Assistance of Trial Counsel

Petitioner claims that his trial counsel provided ineffective assistance by failing to: (1) object to the government's fingerprint evidence (Claim 15); and (2) conduct a proper investigation into the factual basis for Jennifer Wilson's testimony, retain a DNA expert to testify at trial, and call

certain exculpatory witnesses (Claim 16). Petitioner argues, in essence, that if his trial counsel had done the various things he is accused of failing to do, additional reasonable doubt may have been injected into the case. Because petitioner has failed to demonstrate that, but for his trial counsel's alleged errors, the result of his trial would have been different, see Allison, 388 F.3d at 369 (quoting Strickland, 466 U.S. at 694), Claims 15 and 16 are necessarily dismissed.

## 9. Claim 17 - Ineffective Assistance of Appellate Counsel

Because the various grounds for petitioner's claim of ineffective assistance of appellate counsel have already been dismissed as meritless, appellate counsel did not provide ineffective assistance by failing to raise them on appeal.

## Conclusion

For the reasons given, Ahern's motion for a new trial based upon newly discovered evidence (document no. 102 in No. 00-cr-148-01-SM) is denied, as is his motion for appointment of counsel (document no. 104). Because the court's decision does not rely in any way on the arguments and materials contained in the

33

government's supplemental objection (document no. 107), Ahern's motion for an extension of time to file a reply to that objection (document no. 112) is denied, as is his motion for discovery (document no. 109).

In addition, for the reasons given, Ahern's petition under 28 U.S.C. § 2255 (No. 04-cv-474-SM) is dismissed. Accordingly, the clerk of the court shall enter judgment in accordance with this order and close that case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

April 29, 2005

cc: Sean Ahern
    Donald A. Feith, Esq.
    U.S. Probation
    U.S. Marshal